UNITED STATES of America

v.

William KROS.

Crim. No. 23185.

United States District Court
E. D. Pennsylvania.
March 6, 1969.

Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., Anthony F. List, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Martin A. Ostrow, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

CLARY, Chief Judge.

This case was previously tried before Judge Thomas A. Masterson sitting without a jury. After the close of testimony by both parties, however, Judge Masterson, before rendering a verdict, granted a rehearing. Subsequently, all counsel and the defendant agreed that this case should be decided by the undersigned on the record. With this history now recorded, we move to the consideration of the merits of the case as demonstrated by the entire record, including transcript, exhibits, and briefs submitted by both parties.

The defendant, William Kros, has been charged on two counts with violating Title 18 U.S.C. § 1461 which forbids, among other things, a knowing use of the mail for the delivery of "non-mailable

matter".[1] More specifically, it is charged that the defendant on two separate occasions, i. e., August 18, 1967, and December 4, 1967, sent "obscene, lewd * * * (and) lascivious" films through the mail. At his arraignment on March 12, 1968, the defendant entered a plea of not guilty, and subsequently made a motion to dismiss the indictment on the grounds that the " * * * offense was perpetrated solely as a result of an entrapment * * * ". He also made a motion to suppress at trial an allegedly involuntary statement made by the defendant after his arrest on December 8, 1967, but before his Commissioner's hearing. The defendant waived his right to a jury trial and, by agreement of counsel, both the defendant's preliminary motions were heard by the trial Judge.

During the trial, evidence relevant to each of these motions was elicited and at the conclusion of the trial, counsel were requested to brief the relevant law. For reasons discussed below, the defendant is adjudged not guilty.

In June, 1966, an inspector of the United States Post Office Department completed a membership application in the fictitious names of Mike and Elaine Laphan for the purpose of joining the Swingers Life Club, which is an organization composed of " * * * modern, broadminded people who share * * * 'special' interests and desires". See G-1-A Swinger's Life Application Form. Although the Swingers Life Club promotes a variety of social activities for its members, i. e., " * * * swinging club parties, dances and banquets", its most significant activity is the publication of the Swingers Life Magazine (hereafter referred to as "Swingers Life"), to which all members of the Club subscribe. This magazine is composed almost exclusively of a series of "advertisements" placed by members of the Club for the purpose of corresponding with and meeting other members of the Club. Both unmarried and married people sponsor these advertisements. The advertisements are arranged alphabetically by reference to the State in which the advertisers reside. Typically the ads are requests to meet others for "fun and good times", "swapping photos", etc. Most of the advertisements are accompanied by a photograph of the advertiser, usually depicting a semi-nude woman in a sexually provocative pose.

The Post Office Department decided to place an ad in Swingers Life because " * * * this magazine * * * (is) known to bring forth people who wish to sell obscene matters and to reply to ads in (the) * * * magazine", N.T. p. 12. Even though the Post Office contends that the magazine is nothing more than a vehicle for people desiring to trade in pornography and obscenity, the Department has not initiated any prosecution against the magazine itself, nor has it brought proceedings with respect to its mailing privileges. N.T. pp. 12, 14 and 156.

As new members of the Swingers Life Club the Laphans, i. e., the Post Office Department, were entitled to place an advertisement in all issues of the magazine to be published in the year following their joining the Club. The Post Office Department did place an advertisement which appeared in the magazine as #37 in the "Pennsylvania" section which read:

"Young attractive couple, anxious to exchange correspondence, experiences, photos. Love parties and believe three isn't a crowd. She is 28, 5' 5", 125 lbs, blond hair and blue eyes. He is 30, 5' 10", 170 lbs, brown hair and blue eyes".

The Post Office Department received in excess of 75 responses to this advertisement from Club members located throughout the United States between

1. Section 1461 reads, in pertinent part: "Every obscene, lewd * * * or vile article * * * (i)s declared to be non-mailable matter * * * Whoever knowingly uses the mails for the mailing * * * of anything declared by this section to be non-mailable * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both".

the date when the advertisement originally was placed and August 9, 1967 when the initial response from the defendant was received.

On August 9, 1967, the Department received a letter signed by a certain Bill Hunter, with the return address of Bill Hunter, Box 4606, Philadelphia, Pa. 19127. It was undisputed that the defendant, William Kros, used the pseudonym "Bill Hunter", leased Post Office Box 4606 in 1965 and continued to use the Post Office Box until his apprehension in 1967. N.T. pp. 35–36, 111. His letter, marked G-2 and introduced into evidence at the trial, read:

> "Dear #37
>
> I saw your ad and I was wondering if you would like to buy some 8 mm smoker movies. I have 5 reels that are in very good condition and I am asking $15.00 each. You can call me at home bet. 5 & 6 P.M. for further information.
>
> If you don't want to buy films maybe we can get together anyway, if you would like.
>
> Sincerly (sic),
> Bill Hunter
> Box 4606
> Phila. Pa. 19127"

This letter initiated a chain of correspondence between the defendant and the Post Office Department which eventually culminated in defendant's use of the mail to sell the films and his subsequent arrest. In order to resolve the entrapment issue, this correspondence must be reviewed in detail.

The Post Office Department responded swiftly to defendant's letter of August 9. In a letter inexplicably dated August 8, 1967, the postal inspector, adopting the alias of "George Schmetabak", penned the following response:

> "Dear Mr. Hunter:
>
> Thank you for answering our ad in Swingers Life. You said in your letter that you could be reached by telephone at your home, but you did not give your telephone number. It's just as well, since we are spending our summer vacation in N. J. right now.
>
> Right now I can't afford to buy all 5 reels of film you offered, however, I am enclosing a money order for $15.00. Please pick out one reel of film you feel would be most enjoyable.
>
> Hope to hear from you soon,
> George Schmetabak
> P. O. Box 567
> Absecon, N. J."

This letter was marked G-3 and introduced into evidence at the trial, together with a form filled out by the inspector and addressed to Postmaster Harry H. Pedersen, Jr., Absecon, N. J. 08201, requesting the latter to purchase a money order made out to Bill Hunter and to enclose the money order with Schmetabak's response to defendant's advertisement. On August 18, 1967, defendant placed an eight millimeter spool containing 200 feet of black and white film in a brown paper bag and mailed it to George Schmetabak at the Post Office Box Number in Absecon, N. J. At the trial defense counsel stipulated that this film, and the film later mailed by defendant in December, were " * * * obscene, lewd and vile".

Shortly thereafter, in a letter postmarked September 4, 1967, defendant continued his correspondence with the Post Office Department:

> "Dear George:
>
> This is the first time I got a chance to write you since I sent you the movie. I hope you like it, if not you may exchange it if it was not clear or was damage (sic). I would like to meet you some day in the near future. I am enclosing a picture of ,myself I would like one of both of you if it is not to (sic) much trouble. I hope to hear from you soon.
>
> Sincerely,
> Bill Hunter
> Box 4606
> Phila., Pa. 19127
> Phone WA 4–2049
> Area Code 215". (See Exhibit G-7).

The enclosed picture depicted defendant standing with a towel around his waist. See Exhibit G-7A. Subsequently, "George" responded using stationery from the Penn Harris Motor Inn, in Harrisburg, Pa.:

Nov. 14, 1967

"Dear Bill,

You must think that I am angry at the film you sent me and the nice letter but it is not so—only we had to go to Pittsburgh to settle some personal matters. I still have some stationery we picked up on the trip—that's why this paper. This was the nicest place along the way—we had a ball here—met some people who enjoy the same things we do—need I say more? Now that we are home again for a short time only—I am sorry to say, because my company (electronics) is sending me on a trip to instruct some new employees.

Now to business—hope you have some more of those films—I would like some—the last was good—also you talked about getting together—well I do expect to spend one or two days in Phila. in a few weeks—maybe sooner— what arrangements can be made? Please write when and where we can get together. I am going alone. How about you—are you married and how does the wife (if any) feel about meeting? In any case Let's hear about the films and all because my wife will have some friends home while I am gone and may need them.

Write soon.

P.S. I got a friend that also heard from you but never got an answer to his letter. He lives in Pittsburgh but keeps his Post Office Box in Phila. because he gets there often and likes to keep it quite (sic). Mike Laphan is his name." (Exhibit G-8).

Again the defendant, obviously enthusiastic about the prospect of meeting a real "swinger", responded rather immediately to "George's" letter:

Nov. 22

"Dear George,

I just received your letter today, Nice to hear from you. About the film's (sic) how many do you want and I was wondering if you will pick them up or do you want me to send them?

And as far as Mike Laphan. You tell him to write to me and let me know what he wants. I must have miss (sic) placed his letter but if he wants to buy film I will be glad to sell them to him. You see that's how I get new film I buy them and after I see them I like to sell them and get new ones.

I am married and I would like to have my wife to swing (sic) but she is a little learly (sic) I hate to bring it up always to (sic) so I let it go at that I was wondering how you talked you (sic) wife into swinging? Maybe you could help me. And as for me It's hard to meet couples for a threesome most of the time they get me a girl for the night or I bring a girl along but it's hard to find a girl who swings always.

When your (sic) in phila. (sic) you can call me at home around 6 P.M. I am always home about that time and if not leave your name and I will call you as soon as I get in. I hope to hear from you soon.

SINCERELY

BILL HUNTER
Box 4606
PHILA. PA. 19127
Phone WA 2-2049".

"George" eagerly responded by ordering another film:

November 27, 1967

"Dear Bill,

I just got back the other day and saw your letter waiting for me. I sure am interested in more films. I was talking to Mike Laphan the other day and we are making some arrangements about me coming to Philadelphia so that I can have a real good time.

With Christmas coming up I could use another role of film in case some

friends stop over who I know would enjoy them. Enclosed is a money order for $15.00. I guess the price is still the same.

Thanks again,

George Schmetabak
P. O. Box 567,
Absecon, N. J. 08201"

(See Exhibit G-11)

Defendant responded by transmitting a reel containing 200 feet of 8 millimeter black and white film enclosed in a brown envelope addressed to Absecon, N. J.

On December 8, 1967, the postal inspector, in the company of a Deputy United States Marshal, Thomas O'-Rourke, obtained a warrant for the arrest of the defendant and proceeded to his home to serve the warrant. N.T. p. 37. The defendant's wife was present when they arrived and, approximately an hour later, defendant arrived home from work. Defendant was advised in vague terms of the charges against him and was given the warnings required by Miranda, N.T. pp. 37, 158. With the assistance of the postal inspector, the defendant prepared and signed a "confession" and then was taken to the United States Commissioner for a preliminary examination.

█ In advancing the defense of entrapment the defendant argues that the commission of the crime with which he is charged was induced by the active conduct of the Government. The Government argues that, even if the Post Office Department did induce the commission of the crime, the defendant nevertheless was predisposed to commit the crime and hence was not entrapped. The parties' respective arguments are representative of the contentions typically raised in entrapment cases. See Hannah v. United States, 396 F.2d 785, 786 (5 Cir. 1968), Sherman v. United States, 356 U.S. 369, 373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), Sagansky v. United States, 358 F.2d 195, 202 (1 Cir. 1966), Hansford v. United States, 112 U.S.App.D.C. 359, 303 F.2d 219 (1962), and United States v. Bishop, 367 F.2d 806, 809 (2 Cir. 1966). With respect to these issues the defendant

bears the initial burden of showing that the Government actively induced his alleged offense. Once the defendant satisfies this burden, the burden shifts to the Government to establish beyond a reasonable doubt that defendant was predisposed to commit the offenses without the active encouragement of the Government. See *Sagansky*, supra, 358 F.2d at 202 and "The Defense of Entrapment in the Federal Courts", Lester B. Orfield, Duke Law Journal, Vol. 1967, No. 1, p. 39, 69.

█ The defendant here easily satisfied his initial burden of establishing inducement when at the trial the Government investigators themselves admitted placing the advertisement in Swingers Life which initiated the correspondence culminating in defendant's mailing of the obscene films. Not content with responding to the advertisements placed in the magazine by others, the Government admittedly composed this advertisement with the intention of ferreting out those who might use the mails for trading in obscenity.

█ The active nature of the Government's role in the commission of these offenses is reflected graphically by the correspondence between defendant and his would-be "pen pal" George Schmetabak. Although defendant's initial response to the advertisement refers to a desire to sell films, it in no way suggests that he is interested in employing the mail for such purposes. In fact, even this first letter reflects what the overwhelming evidence at the trial established as defendant's predominant motive, i. e., meeting other people on a "social" basis. Schmetabak's response cleverly forced defendant's hand. The agent implicitly made clear to "Mr. Hunter" that any person-to-person meeting was unlikely for the present since " * * * we are spending our summer vacation in N. J. right now". He then lured defendant into committing a federal offense by enclosing a money order with his letter and by requesting him to " * * * pick out one reel of film you feel would be most enjoyable". Indeed, the Gov-

**978**

ernment's actions from the first typify the "creative activity" involved in entrapment which our Courts most vigorously condemn. See *Sherman,* supra, 356 U.S. at p. 372, 78 S.Ct. 819.

The defendant's response actually showed his relative naivete in these matters. A sophisticated panderer of obscene material would not have immediately mailed the film. Instead, he would have responded cautiously in hopes of arranging a meeting at which such wares as he handled could be traded in more discreet fashion. Defendant, on the other hand, found himself with a money order in his hand and with a request to "pick out the most enjoyable film". His conduct was more characteristic of the "lonely heart" seeking to ingratiate himself with a new correspondent and potential love-mate than of a trader in obscenity.

The shrewdness of the Government's actions is evidenced further by the correspondence which led up to the mailing of the second film. The letters of November 14, 22 and 27 reflect defendant's frustrated efforts to arrange a meeting with his new-found friend, and the Government's successful efforts to disguise its identity and maintain the impersonality of a mail relationship. The Government's techniques were in fact so compelling that, in December, 1967, when defendant received the second $15.00 money order, he was left with no choice, if he desired to continue his pursuit of Mr. Schmetabak, but to mail the latter a film as soon as possible.

The Government concedes that the conduct of its agents at least partially induced defendant's offenses. It insists, however, that it has satisfied its burden to show beyond a reasonable doubt that defendant was predisposed to commit these offenses and that, therefore, defendant cannot be excused because of the Government's role in exposing them. The Government has advanced several contentions in support of this position.

■ Two of the Government's general contentions are accurate, but not particularly probative of defendant's "criminal predisposition". First, only a very small percentage of the 75 or more replies which the Government received offered obscene films for sale. This fact, however, reflects as much the incaution of the defendant as it does his inclination to commit those acts which Section 1461 proscribes. Secondly, the similarity of the Government's advertisement to those placed by private persons arguably undercuts the significance of the Government's role in inducing these offenses. No evidence presented at trial, however, contradicts the inference arising from the correspondence that defendant would have exchanged his films at personal meetings rather than sending this material through the mail, had the Government not induced him to do so.

■ The Government contends, however, that letters written by defendant in the past in response to advertisements placed in Swingers Life and similar magazines conclusively establish his predisposition to commit these offenses. Several of these letters, like several of the letters in this final correspondence, do reflect defendant's interest in buying and selling films. But to buy and/or sell an obscene film is not an indictable offense under Section 1461 and none of the material evidence presented by the Government reflects defendant's intention to perform those acts which constitute violation of the United States Code. The evidence at trial clearly indicated that defendant used the mails for the delivery of the films only because his correspondent insisted that he do so.

■ The defendant's past correspondence showed that he was primarily interested in meeting other people who shared his enjoyment of extra-marital or unusual sexual activities. Indeed, the record shows that on at least two occasions he was successful in meeting a sexual partner through responding to ads such as the one placed by the Government in this case. By permitting such publications as "Swingers Life" to be sent through the mails, the Government,

in a sense, lends an aura of legitimacy to all of the bizarre sexual activities which are explicitly suggested by each of the hundreds of personal ads which make up the magazine. Although this is not in itself enough to sustain the defense of entrapment, particularly where, as contended by the Government here, its tolerance of the magazine is constitutionally required, when the Government itself goes further and runs an ad which is calculated to stimulate the prurient interest of persons such as the defendant, it cannot with good grace complain of the natural and probable consequences of its own act.

 The doctrine of entrapment focuses both upon the Government's conduct and defendant's criminal predisposition, but the thrust of the doctrine is to enjoin the Government from acting in improper ways:

> "The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime." *Sherman,* supra, 356 U.S. at p. 384, 78 S.Ct. at p. 826. (Concurring Opinion, Frankfurter, J.).

As stated in the leading case of Sorrells v. United States, 287 U.S. 435 at 457, 53 S,Ct. 210 at 218, 77 L.Ed. 413 (1932):

> "The doctrine (of entrapment) rests * * * on a fundamental rule of public policy. The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court * * * to protect itself and the government from * * * prostitution of the criminal law".

In this case, it is clear that the Government actively promoted the commission of the crime in question, first by placing its own enticing ad in a magazine of the "Swingers· Life" variety and then maneuvering defendant to insure that he would use the mail to deliver the films and thus commit a federal offense. To sustain a conviction in this case would be to give judicial approval to methods of law enforcement which can only in the long run contaminate the temple of justice itself.

Accordingly, it is adjudged that the defendant is not guilty by reason of entrapment.