UNITED STATES of America,
Plaintiff-Appellee,

v.

Raymond E. KAMINSKI,
Defendant-Appellant.

No. 82–1413.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 21, 1983.

Decided March 21, 1983.

Posner, Circuit Judge, filed concurring opinion.

Michael B. Nash, Chicago, Ill., for defendant-appellant.

William A. Spence, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, POSNER and COFFEY, Circuit Judges.

PELL, Circuit Judge.

■ Defendant was convicted after a jury trial of travelling in interstate commerce to promote an unlawful activity, arson, in violation of 18 U.S.C. § 1952(a)(3), transporting an explosive in interstate commerce unlawfully to damage and destroy a building in violation of 18 U.S.C. § 844(d), and maliciously attempting to damage and destroy, by means of an explosive, a building used in interstate commerce in violation of 18 U.S.C. § 844(i). Defendant relied upon the defense of entrapment at trial and now argues that the evidence demonstrated that he was entrapped as a matter of fact and law. We must assume that the jury chose to accept the evidence in the light most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

*I Facts.*

In January or February of 1981 defendant accompanied his girlfriend during a visit to Northwest Parish Credit Union in an attempt to reclaim her automobile, which had been repossessed. In the course of this visit defendant spoke with James Kramer, a/k/a James Seider, an employee of the credit union. Unbeknown to defendant, Kramer was also employed as an informant for the Bureau of Alcohol, Tobacco, and Firearms (ATF). Defendant mentioned that he was looking for work and was interested in buying and selling cars. A week later defendant again visited the credit union and told Kramer that he needed money and would be willing to repossess cars and was not particular about the legality of his employment. Defendant returned a few days later and spoke with Kramer, mentioning that he was experienced at blowing up and burning buildings and would be willing to put his skills to work for Kramer. Kramer said that he would keep this in mind. Defendant repeated this offer in March. Kramer informed Special Agent Hal Walker of ATF's Arson for Profit Group that defendant purported to be an arsonist for hire.

Defendant did not return to the credit union until September, when he came to buy a car for his mother. During this visit defendant explained that he had been in Texas during the summer and had been employed to blow up a building. Because of his exploits in Texas defendant had been forced to make a hasty return to Chicago and was in need of money. Defendant repeated this story to an undercover agent who was working with Kramer. The agent later tried unsuccessfully to verify defendant's claim that a building had been blown up in Texas. Kramer told defendant that he knew someone who might be interested in hiring an arsonist.

On October 1, 1981, Kramer introduced defendant to agent Walker during a telephone conversation. Walker told defendant that he was looking for someone to blow up buildings and would be interested in talking with defendant. Later that afternoon Walker made a telephone call to defendant and said that he needed someone "to take down a building." When asked about his experience defendant replied, "I've burned 'em. I've never blown 'em up." Defendant expressed interest in meeting Walker and discussing the possibility of destroying the building. This conversation was recorded, as were all subsequent conversations.

Walker and defendant met the next day at a bar to discuss business. Walker said that he wanted to hire a professional arsonist, which prompted defendant to boast about his credentials as an arsonist. Defendant explained how he could start a fire that would appear to be an electrical accident or the result of a furnace explosion. He also claimed to have burned three buildings and repeated his account of working in Texas "making things go wrong" in a building. Walker was suitably impressed and mentioned that there might be more jobs in the future if the first went well. Defend-

ant promised that he would not back out of the deal, and Walker said that he would pay defendant $1,000 for destroying the building.

After several telephone conversations, Walker and defendant agreed to meet at an all-night diner before driving into Wisconsin to examine the tavern defendant was to destroy. Defendant failed to make the meeting because of mechanical problems with his car, but assured Walker the next day that he was not withdrawing from the job. On October 13 the two men drove to Wisconsin to visit the tavern. During the trip defendant discussed his experiences and explained that he preferred to use lighter fluid because, unlike gasoline, it left no chemical residue to indicate arson. Defendant also mentioned that he was attempting to get in touch with a professional arsonist who could teach him how to use timers to start fires. Walker volunteered to finance defendant's "education." They inspected the tavern and agreed to rendezvous at a diner in Richmond, Illinois, that morning.

Walker and defendant met at the diner, where Walker paid $500 to defendant and arranged to pay the remaining $500 after the tavern was destroyed. Defendant took a key to the tavern and, after bending his license plates to avoid detection, drove his own car into Wisconsin. Defendant was arrested by surveillance agents after letting himself into the building and removing one of two cans of lighter fluid from his coat pocket. After being advised of his rights he offered to make a deal, explaining that this was his first arson job and that he was working for "Hal" (Walker's first name). When he saw Walker enter the tavern he exclaimed "you set me up." Walker asked about the arson in Texas, but defendant, prophetically, would only reply, "I can't tell you that. They will kill me. I will just have to go to jail."

At trial defendant confirmed that he had met with Walker and admitted the accuracy of the recorded conversations, but claimed that none of what he told Walker concerning his expertise as an arsonist was true.

Defendant also claimed that he had never been to Texas and that one of the buildings he claimed to have burned never existed. He explained that his knowledge of various arson techniques came from working at a gas station and at an engineering firm and from talking with firemen. He testified that he had made up the story about Texas to stop Kramer from "pestering" him, although he admitted that Kramer had never "pestered" him about starting fires. Defendant also admitted that he had not been pressured by Walker and had had plenty of opportunities to withdraw from the scheme but had continued to meet with Walker because he was interested in burning the building. He also conceded that he had agreed to destroy the tavern before knowing how much he would be paid.

## II  Entrapment.

Defendant argues that the evidence established entrapment as a matter of fact and law. In making this argument defendant has confused the defense of entrapment with the separate defense of governmental misconduct in violation of due process. As a first step in an examination of the distinction between the two defenses we turn to the four major entrapment decisions of the United States Supreme Court.

In the first of these cases, *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), defendant was persuaded to sell illegal liquor to a government agent by repeated appeals to defendant's sympathy for a fellow war veteran. The majority of the Court, reversing the trial court's refusal to submit the defense of entrapment to the jury, held that *as a matter of statutory construction* the defense of entrapment was raised by the introduction of evidence that the crime was committed at the instigation of the Government and that the defendant was not predisposed to commit the offense. Under this analysis entrapment is a question of fact to be decided by the jury. In a separate opinion three members of the Court argued that the defense of entrapment should focus upon the extent of the Government's misconduct and

was grounded in the judiciary's power to "protect itself and the government from such prostitution of the criminal law." 287 U.S. at 457, 53 S.Ct. at 218. Under this objective test the defendant's character is irrelevant. The minority argued that it was the duty of the court, not the jury, to close its doors to prosecutions founded upon governmental misconduct in inducing or creating crime.

This difference of opinion was repeated in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1952), in which the majority held that "[t]o determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." 356 U.S. at 372, 78 S.Ct. at 820. A minority of the Court argued for an objective test of the Government's conduct that would not consider the predisposition of the defendant. Both groups agreed that entrapment was established as a matter of law when the uncontroverted evidence disclosed that defendant sold narcotics to an informer only after numerous pleas to defendant's empathy for one suffering the ravages of withdrawal overcame defendant's initial reluctance. There was no persuasive proof of defendant's predisposition and defendant made no profit from the sales. In effect the Government had created a criminal out of a person attempting to break his addiction simply for the sake of arresting him.

Although the members of the Court have changed, the disagreement over the source and scope of the entrapment defense remains. In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the majority held that entrapment is limited to those situations in which the "Government's deception actually implants the criminal design in the mind of the defendant." 411 U.S. at 436, 93 S.Ct. at 1645. The majority conceded that "we may some day be presented with a situation in which the conduct of the law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," *id.* at 431–32, 93 S.Ct. at 1642, but

held that supplying one ingredient, not itself illegal, to defendants engaged in the manufacture of methamphetamine was not such conduct. The dissent, once again, argued for an objective test of the Government's conduct.

Most recently five members of the Court reconfirmed that entrapment "focus[es] on the intent or predisposition of the defendant to commit the crime." *Hampton v. United States,* 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976). Two of these justices, however, were unwilling to rule out the possibility of a separate due process defense if the Government's conduct was sufficiently outrageous, making a total of five justices willing to recognize that a defendant's predisposition is irrelevant when the evidence establishes truly egregious governmental misconduct.

■ We may not reweigh the arguments made in support of these two positions, but rather must proceed on the assumption that the defense of entrapment is not available to a predisposed defendant while a separate defense based solely upon governmental misconduct may be raised by even the most hardened criminal. *See United States v. Hodge,* 594 F.2d 1163 (7th Cir.1979); *United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978); *United States v. Garcia,* 562 F.2d 411, 415 (7th Cir.1977).

■ Defendant has expounded at great length upon the unsavory nature of Kramer's character and other exculpatory evidence in advancing the argument that the Government failed to prove his predisposition as a matter of fact. Matters of fact are for the jury, not a court of appeals. Regardless of how repulsive Kramer may be the jury was free to believe his testimony, as they obviously chose to do. On appeal we are limited to considering whether the evidence established entrapment as a matter of law, which only occurs when the absence of defendant's predisposition appears from the uncontradicted evidence. *Sherman v. United States,* 356 U.S. at 373, 78 S.Ct. at 821; *United States v. Spain,* 536 F.2d 170, 173 (7th Cir.1976), *cert. denied,*

429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97; *United States v. Cardi*, 478 F.2d 1362, 1367 (7th Cir.1973), *cert. denied*, 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237. This is not such a case.

■ Although there is no infallible means of divining a defendant's predisposition to commit a crime after the fact, there are several factors recognized as relevant in making this determination. We start with the observation that predisposition is, by definition, "the defendant's state of mind and inclinations *before his initial exposure to government agents.*" *United States v. Jannotti*, 501 F.Supp. 1182, 1191 (E.D.Pa. 1980), *rev'd on other grounds*, 673 F.2d 578 (3rd Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (emphasis added). This answers defendant's bizarre contention that "the agents literally entrapped him into a state of predisposition." One is either predisposed to commit a crime before coming into contact with the Government or one is not, so the argument that one could be entrapped into having a state of predisposition is meaningless. We now turn our attention to the factors relevant in determining predisposition.

> Among these are the character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in the criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and the nature of the inducement or persuasion supplied by the Government. While none of the factors alone indicates either the presence or absence of predisposition, the most important factor ... is whether the defendant evidenced reluctance to engage in criminal activity which was overcome by repeated Government inducement.

*United States v. Reynoso-Ulloa*, 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978); *see also United States v. Townsend*, 555 F.2d 152, 155 n. 3 (7th Cir.1977), *cert.*

*denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184; *United States v. Jannotti, supra*, 501 F.Supp. at 1190–91, 1200.

Before examining the facts of this case we should note the peculiar nature of one of these factors: the inducement offered by the Government. As stated previously, predisposition exists prior to contact with the Government. In many cases, however, there is little direct evidence of the defendant's state of mind prior to interaction with Government agents and we must instead rely upon indirect proof available through examination of the defendant's conduct after contact with the agents. Should the defendant initially reject a suggestion that he commit a crime this is indicative of a lack of predisposition. Conversely, should he initiate contact with the agents in order to commit a crime this is strong proof of predisposition. The amount of inducement offered by the Government, however, has no such logical correlation with defendant's predisposition as the Government may offer as much as it wishes to any potential defendant. The amount of inducement gains its relevance through the defendant's reaction to the lure. If the amount offered is "a substantial inducement to a first offense," *United States v. Jannotti, supra*, at 1200, this may negate the inference normally drawn from a defendant's ready acquiescence to a suggestion that he commit a crime as even a person with no criminal predisposition may abandon his moral standards when the reward is substantial. A large inducement, however, is not proof in and of itself that defendant was not predisposed to commit the offense. In a case such as that before us today, in which defendant agreed to commit the crime before knowing the amount of the reward, this factor is of minimal importance in evaluating a claim of entrapment.

■ Viewed in the light most favorable to the Government the evidence in this case was more than adequate to prove defendant's predisposition. Defendant initiated contact with Kramer and offered his services as a professional arsonist. Although he later claimed to have fabricated the story

about Texas to stop Kramer from "pestering" him the jury was not required to believe this explanation. Furthermore, defendant admitted that Walker had not pressured him and had offered him many opportunities to withdraw from participation in the crime. The jury was also free to believe that defendant was experienced in burning buildings despite his claim to the contrary, and it is uncontested that he had extensive knowledge of the various means of setting fires. Defendant agreed to burn the tavern before he knew how much he would be paid, and at any rate the $1,000 offered by Walker was not exorbitant. Most important, defendant never expressed any reluctance at committing the crime and in fact expressed considerable enthusiasm about the job. In short, defendant was not some naive innocent forced into committing a crime by the Government.

Before turning to defendant's due process claim we wish to point out that even if defendant had been fabricating his credentials as an arsonist and had never set a fire in his life this would not negate a finding of predisposition. Predisposition is a question of intent, not experience, and to the extent defendant engaged in puffery to sell his wares this only serves to bolster a finding that he was predisposed before coming into contact with Kramer and Walker.

*III   Due Process.*

■ Defendant argues that the governmental misconduct exhibited in this case was so flagrant as to mandate reversal of his conviction. The Supreme Court has not yet given any content to the principle that governmental misconduct may bar prosecution even absent any other deprivation of defendant's constitutional rights. However, an examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant.

In seeking to detect and punish crime, law enforcement agencies frequently are required to resort to tactics which might be highly offensive in other contexts. Granting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process or evoke the exercise by the courts of their supervisory powers so as to deny to the officers the fruits of their misconduct.

*United States v. Quinn,* 543 F.2d 640, 648 (8th Cir.1976). This case, which is nothing more than a typical example of undercover police work, is a far cry from the outrageous governmental misconduct envisioned in *Russell* and *Hampton.* Those few cases in which federal courts have recognized this defense have involved misconduct far removed from the facts before us today. *See United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978) (Government informer contacted defendant about manufacturing narcotics; Government supplied chemicals, glassware, and farmhouse used for manufacturing; informer did lion's share of the manufacturing while defendant's involvement was minimal); *United States v. Archer,* 486 F.2d 670 (2nd Cir.1973) (federal agents deceived court and grand jury by staging sham crime to investigate corruption in state prosecutor's office); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (Government agent initiated contact with defendants and used veiled threats over extended period of time to convince them to produce illegal whiskey; supplied ingredients and was only customer of defendants).

■ In this case Walker had every reason to believe that defendant was a professional arsonist seeking employment and properly decided to take action before defendant found a bona fide customer. The use of informants and the offer of a reasonable inducement are proper means of investigating crime. *See United States v. Hodge,* 594 F.2d 1163 (7th Cir.1979); *United States v. Swets,* 563 F.2d 989, 990 (10th Cir.1977),

cert. denied, 434 U.S. 1022, 98 S.Ct. 748, 54 L.Ed.2d 770 (1978); *United States v. Esquer-Gamez*, 550 F.2d 1231, 1234 (9th Cir. 1977). Undercover police work in general, and the use of men such as Kramer in specific, is an unattractive business, but that is the nature of the beast and we see nothing improper in the manner in which this investigation was carried out. Defendant's judgment of conviction is AFFIRMED.

POSNER, Circuit Judge, concurring.

I join Judge Pell's opinion for the court without any reservations, and write separately merely to float a suggestion for giving practical content to the elusive concept, which is fundamental to the entrapment doctrine, of predisposition to commit a crime.

If the police entice someone to commit a crime who would not have done so without their blandishments, and then arrest him and he is prosecuted, convicted, and punished, law enforcement resources are squandered in the following sense: resources that could and should have been used in an effort to reduce the nation's unacceptably high crime rate are used instead in the entirely sterile activity of first inciting and then punishing a crime. However, if the police are just inducing someone to commit sooner a crime he would have committed eventually, but to do so in controlled circumstances where the costs to the criminal justice system of apprehension and conviction are minimized, the police are economizing on resources. It is particularly difficult to catch arsonists, so if all the police were doing here was making it easier to catch an arsonist—not inducing someone to become an arsonist—they were using law enforcement resources properly and there is no occasion for judicial intervention. And I am persuaded that that is the situation in this case.

Thus in my view "entrapment" is merely the name we give to a particularly unproductive use of law enforcement resources, which our system properly condemns. If this is right, the implementing concept of "predisposition to crime" calls less for psychological conjecture than for a common-sense assessment of whether it is likely that the defendant would have committed the crime anyway—without the blandishments the police used on him—but at a time and place where it would have been more difficult for them to apprehend him and the state to convict him, or whether the police used threats or promises so powerful that a law-abiding individual was induced to commit a crime. If the latter is the case, the police tactics do not merely affect the timing and location of a crime; they cause crime.