UNITED STATES of America,
Plaintiff-Appellee,

v.

William L. THOMA,
Defendant-Appellant.

No. 83–1151.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1983.

Decided Jan. 20, 1984.

Certiorari Denied June 4, 1984.
See 104 S.Ct. 2683.

Terence E. Flynn, Chicago, Ill., for defendant-appellant.

James P. White, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, COFFEY and FLAUM, Circuit Judges.

PELL, Circuit Judge.

Defendant Thoma was indicted on three counts of mailing obscene material for the purpose of sale, the production of which involved the use of a minor engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(1). After an unsuccessful motion to suppress statements made during a search of defendant's home, defendant waived jury trial and presented defenses based on entrapment, outrageous Government conduct, and the Government's failure to prove all of the elements of a section 2252(a)(1) violation. The court rejected these claims, found defendant guilty and sentenced him to four years imprisonment and four years of probation. On appeal defendant again argues that his statements should have been suppressed, that he was entrapped into committing the crime, that he was the victim of outrageous Government conduct, and that the Government did

not meet its burden of proof. We will deal with each of these claims in turn.

*I Facts*

During September of 1981, Postal Inspector John Ruberti created an undercover organization known as the "Crusaders for Sexual Freedom" (CSF), which he intended to use in investigating prohibited mailings of child pornography. CSF purported to be a clandestine organization made up of people who "believe we have the right to read what we desire and the right to be true hedonists." CSF's main function, however, was not philosophical, but rather involved printing and distributing coded advertisements through which its members could find means of gratifying their sexual desires, regardless of how bizarre.

On November 2, 1981, Ruberti sent a CSF test survey to defendant. The survey was preceded by a short text that expounded upon the group's philosophy and explained that CSF had received defendant's name from a mailing list. Defendant was instructed to disregard the letter if there had been a mistake in mailing it to him. Defendant had the option of returning the survey anonymously or of indicating his desire to join CSF by providing his name and address. Defendant did neither, and instead threw the survey away. The torn survey, parts of which had been filled out by someone, was found in defendant's garbage by the Downer's Grove Police Department, which was conducting a "trash cover" of defendant's residence.

Ruberti testified that he designed the survey to detect pedophiles, those who have an interest in minor-oriented, sexually-explicit material. Ruberti also intended the survey to reveal whether the pedophile used the mails to purchase material and whether he was a collector of this type of material. Ruberti sent the survey to defendant after receiving information that defendant was purchasing pedophilia through the mail and might be involved in producing pedophilia. Ruberti did not have any information indicating that defendant was involved in any prior prohibited mailings.

On November 24, 1981, Ruberti sent a copy of "CSF Friends" to defendant. This 8-page pamphlet contained questions from fictitious members, responses from the editorial staff, and ninety advertisements that covered a wide variety of sexual tastes. All of the material in "CSF Friends" had been authored by Ruberti. The pamphlet also contained a form for placing advertisements and instructions on how to answer an advertisement. Either to place or respond to the advertisements one needed a CSF code number, which defendant—as a nonmember—did not have. Ruberti received no response from defendant after this mailing.

On December 9, 1981, Ruberti mailed defendant a letter informing him that he had been sponsored for a free membership in CSF. Defendant filled out the accompanying membership form and returned it to Ruberti via the CSF post box. On December 21, Ruberti sent defendant a letter welcoming him to CSF and assigning him a code number. Defendant did not wait long to take advantage of his membership and soon submitted an advertisement seeking a photo session with "young pre-teen and early teenage boys and girls." Ruberti informed defendant that his advertisement would appear in a few weeks, and that he knew a young lady who might be of use to defendant in the meantime. Defendant did not respond to this suggestion.

Ruberti did not contact defendant again until March 16, 1982, when he sent out the next CSF newsletter. This pamphlet contained messages from "John, Editor of CSF Friends," "Kim, CSF Membership Director," and other nonexistent editors, as well as ninety advertisements, all authored by Ruberti. Defendant's advertisement, the only one not written by Ruberti, also appeared. Defendant responded to seven advertisements, placed two more advertisements seeking a relationship with a mother and children, and sent a letter to "Kim" asking how members were to know whether an advertisement had been placed by the police or if this would amount to entrapment.

Ruberti, writing as "Kim," responded to defendant's concerns about police involvement by stating that CSF was particular about who became a member and had not yet received any complaints. The day Ruberti mailed this letter to defendant, he received defendant's responses to six more advertisements. The following month defendant responded to 21 more advertisements.

Among the advertisements that defendant responded to was one that stated: "Collector would like to buy photos of teen and pre-teen girls." Defendant responded by offering to sell a video tape consisting of 500 photographs of teens and pre-teens. Defendant also expressed an interest in meeting the buyer and mentioned that he had "other material to trade or what have you." Ruberti asked Postal Inspector Truitt in St. Louis to respond to defendant's offer. Truitt sent defendant's asking price, $100, and defendant mailed the video tape. Following a similar scenario, defendant sent video tapes of children engaged in sexually explicit conduct to postal inspectors in Cleveland and Detroit. By June of 1982, Ruberti had been given a new assignment and Inspector Hagedorn had taken over the investigation. Hagedorn arrested defendant and executed a search warrant on June 25. During the search of defendant's house the police found a large amount of video equipment and a photo album containing photographs of minors engaged in sexually explicit conduct. Some of these photographs appeared in the video tapes sold by defendant.

*II Suppression of Defendant's Statements*

During the search of defendant's home a Detective Harrison entered the living room in which defendant was seated. Defendant asked Harrison if he had been involved in defendant's prior arrest for pornography. The detective replied that he had not, but defendant went on to explain that the "only reason he had gotten involved again was that money was tight." Defendant's housemate then warned defendant not to say anything, and Harrison told defendant that

this statement would be used against him. Defendant ignored these warnings and stated that he hoped that he would "get his video equipment returned so he could sell it and get out of the business." Defendant unsuccessfully moved to suppress these statements prior to trial, and now argues that the court erred in admitting them into evidence.

Defendant urges that these statements were the result of an illegal interrogation. Defendant claims that the officers followed a course of conduct designed to force defendant to speak despite his assertion of his right to remain silent. The factual predicate of this argument is as follows: Defendant was arrested at 7:00 a.m., and advised of his *Miranda* rights; defendant stated that he did not wish to make any statements; Inspector Sack nonetheless elicited background information from defendant; defendant spent the next four hours sitting in the living room with Sack and Inspector Schauber engaged in "small talk" about cameras and defendant's van; Detective Harrison entered the room and defendant began the conversation that led to the incriminating statements. These acts, claims defendant, were a subtle, sophisticated and successful attempt to establish a rapport with him that would induce him to make a statement.

It is clear that the inspectors could not interrogate defendant after he exercised his right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). It is equally clear that "interrogation" is not limited to direct questioning, but also encompasses "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). Nonetheless, not all statements made by an accused who has announced his intention to remain silent are inadmissible; the accused is still free to change his mind and volunteer whatever information he chooses. *Mi-*

*randa* 384 U.S. at 478, 86 S.Ct. at 1629. We agree with the district court that defendant's statements to Detective Harrison were volunteered rather than the product of interrogation.

Defendant would have us believe that the officers engaged in a sophisticated campaign to break down his will, the culmination of which was Harrison's entrance. We find this an unrealistic view of the events. There is no evidence that defendant's statements were triggered by Sack's questions regarding defendant's background, or by anything other than the entrance of Harrison, whom defendant thought he recognized from a previous encounter. It strains credulity to believe that Harrison intended his entrance as a form of interrogation, nor is there any evidence that defendant viewed it as such, however subtle. Rather, common sense indicates that defendant's statements were the result of his own volubility and his apparent failure to view his situation as serious. In fact, after Harrison warned defendant that his first statement would be used against him, defendant continued to make statements that later came back to haunt him. These statements were the result of poor judgment, not interrogation. Defendant's statements were properly admitted into evidence.

## III Entrapment

■ Defendant's principal claim at trial was that his conduct was induced by the Government's actions. This claim encompasses both the defense of entrapment and that of outrageous Government conduct. We recently examined the sources of these two, separate defenses in *United States v. Kaminski*, 703 F.2d 1004 (7th Cir.1983), and it would serve no purpose to replow that ground now. For this appeal it is sufficient to note that the defense of entrapment focuses upon whether the Government's actions implanted the criminal design in the mind of an otherwise unpredisposed person. *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In contrast,

the defense of outrageous Government conduct is premised upon the notion that the due process clause imposes limits upon how far the Government may go in detecting crime regardless of the character of the target. *Kaminski* at 1009; *United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978); *United States v. Archer,* 486 F.2d 670 (2nd Cir. 1973); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971). In this case defendant has advanced both defenses, and we will treat each separately.

■ To raise the defense of entrapment defendant was required to produce evidence that the prohibited mailings were induced by the Government, and that he lacked any predisposition to commit this crime. Once defendant accomplished this, the burden shifts to the Government to prove beyond a reasonable doubt that defendant was predisposed to commit the offense. *Sherman v. United States,* 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958); *United States v. Fields,* 689 F.2d 122, 124 (7th Cir.1982), *cert. denied,* 459 U.S. 1089, 103 S.Ct. 573, 74 L.Ed.2d 935; *United States v. Hinkle,* 637 F.2d 1154, 1158 (7th Cir.1981). We do not agree with the Government's contention that defendant utterly failed to produce evidence of his lack of predisposition, but neither do we agree with defendant's claim that the evidence established entrapment as a matter of law. Rather, the evidence raised defendant's predisposition as a question of fact that was properly for the trier of fact to decide.

To respond to the Government's contention it is enough to point out that the prosecution's evidence demonstrated some degree of Government involvement in coaxing defendant into committing the offense, and that defendant, for whatever reason, was initially reluctant to become involved in CSF. This is enough to raise the defense of entrapment; there is no requirement that defendant testify as to his lack of predisposition or present his own witnesses. *See Sherman v. United States,* 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958) (successful defense of entrapment based solely on Government's witnesses).

This evidence, however, is not sufficient to establish entrapment as a matter of law, which occurs only when the lack of predisposition is apparent from the uncontradicted evidence.[1] *United States v. Kaminski,* 703 F.2d at 1007 (7th Cir.1983); *United States v. Spain,* 536 F.2d 170, 173 (7th Cir.1976), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97. The Government presented sufficient evidence to support the conclusion that defendant was predisposed. As we observed in *Kaminski,* determining whether a defendant was predisposed requires an analysis of the following factors: (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was originally made by the Government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by Government persuasion; (5) the nature of the inducement or persuasion offered by the Government. *Kaminski* at 1008; *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Although all of these factors must be taken into consideration, the most important element of the equation is whether the defendant was reluctant to commit the offense. *Kaminski* at 1008.

Defendant argues that his reluctance in joining CSF should be determinative of the question whether he was predisposed. We are not persuaded by this claim. It is true that defendant did not leap at the first opportunity to join CSF presented to him. It is also true that defendant did not respond to the second mailing, although that is easily explained by the fact that he could not do so without a CSF code number. Even if we assume, however, that defendant's failure to respond to the second mailing was due to reluctance at becoming involved in CSF, this tells us little about defendant's predisposition to commit the crimes charged. Reluctance at joining CSF, which was not itself illegal and which offered both legal and illegal activities, cannot be equated with reluctance at committing the prohibited mailings. This becomes clear when one examines defendant's one stated apprehension about CSF—fear that advertisements might be placed by police officers. Defendant's reluctance at joining CSF may have stemmed, then, not from reluctance to commit a crime, but rather from the natural savvy of one versed in the ways of the pornography trade. We must assume, when reviewing a criminal conviction, that the trier of fact drew all permissible inferences in the Government's favor, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and that the court thus found that defendant's reluctance was not evidence of a lack of predisposition. *See, e.g., United States v. Steinberg,* 551 F.2d 510, 514 (2d Cir.1977) (defendant's reluctance may have been an attempt to protect himself against prosecution).

Defendant also claims that the inducement offered by the Government was such that his capitulation cannot be ascribed to predisposition. As with his argument concerning reluctance, we find this claim unconvincing. Although the Government offered a plethora of apparent opportunities to make contact with persons expressing sexual tastes similar to defendant's, these opportunities encompassed both legal and illegal activities and offered no more inducement to choose the illegal than the legal. Furthermore, the mailings of CSF were spread out over a period of time and, unlike personal contact, could easily be ignored by one not interested in their contents. Finally, the advertisements that defendant responded to did not offer exorbitant amounts of money in exchange for the prohibited mailings, in fact the amount paid

---

1. Defendant claims that we are bound by the decision in *United States v. Kros,* 296 F.Supp. 972 (E.D.Pa.1969), and must therefore find entrapment as a matter of law. *Kros* involved an undercover investigation similar to the CSF operation, but also involved a defendant who the court found was not predisposed to commit the crime. While we are not persuaded that *Kros* was decided correctly, we need not detail our misgivings as there was more than enough evidence of predisposition here.

by the Government was set by defendant. That the Government merely offered an opportunity to commit a crime, coupled with what can at most be described as mild inducement, does not support a claim of entrapment. *United States v. Townsend,* 555 F.2d 152, 155 (7th Cir.1977), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184.

Most of the remaining evidence is equally unavailing to defendant. Once defendant decided to risk responding to the advertisements in CSF, he did so with a vengeance and never evidenced reluctance at making a sale when inspectors, posing as customers, made contact. Finally, as defendant's statements to Detective Harrison illustrate, he was involved in selling child pornography for a profit and possessed the equipment necessary to do so on a large scale. That defendant was also interested in establishing relationships with a mother and children and with his customers does not detract from the evidence of predisposition.

 We conclude that there was sufficient evidence to support the court's finding that defendant was predisposed and therefore not entrapped.[2] We turn now to defendant's claim that the Government's conduct was so outrageous that it violated his right to due process.

*IV Due Process*

We observed in *Kaminski, supra,* that "[a]ssuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant." 703 F.2d at 1009. Defendant argues that in this case the Government violated his constitutionally protected right to possess pornography in the privacy of his home by luring him into placing his collection in the mails. This invasion of the rights of pedophiles, says defendant, mandates a standard lower than "truly outra-

geous" be applied in judging the Government's conduct.

 It is clear that defendant has a constitutionally protected right to possess obscene materials in his home. *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). We also agree that if the Government violated this right in the course of investigating defendant, then the "truly outrageous" standard would not be applicable. We do not agree, however, that the CSF campaign impermissibly induced defendant into leaving the *Stanley* zone of protection by selling his material. As we have already observed, there was more than adequate evidence to support the court's finding that defendant was predisposed to sell obscene material. Furthermore, the inducement offered by the Government was minimal. Defendant was not an innocent collector of pedophilia induced or coerced into selling his collection to the Government, but rather a willing seller who forfeited the protection of *Stanley* to make a profit. The CSF campaign did not violate defendant's First Amendment right to possess obscene material.

 Defendant makes the related argument that the Government's conduct was truly outrageous in that it was no more than a witch hunt for pedophiles. We do not agree with this characterization of the Government's actions for two reasons. First, as we have noted, the Government provided little incentive for a non-commercial collector of pedophilia to give up his *Stanley* protection and the CSF investigation clearly was not geared toward that end. Second, based upon the information Ruberti received about defendant's activities the Government had a good faith basis for investigating defendant. While such a basis is not a constitutional prerequisite to an undercover investigation, *United States v. Jannotti,* 673 F.2d 578, 608 (3rd Cir.1982) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315; *United States v. Myers,* 635 F.2d 932, 941 (2nd Cir.1980),

---

**2.** We reject defendant's claim that the court relied upon inadmissible hearsay evidence in finding defendant predisposed. The evidence referred to by defendant was used by the court solely for the purpose of determining whether the Government had a good faith basis for investigating defendant, and not for determining defendant's actual character.

*cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221, its existence belies the claim that the postal inspectors were simply persecuting pedophiles.

What remains is defendant's claim that the operation of CSF was itself truly outrageous. Although there is no set formula for determining when Government conduct transgresses the boundaries of permissible investigative techniques, there are some recognized factors. When the Government supplies contraband, or becomes intimately involved in its production, then we will examine its conduct closely. *See United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978) (Government supplied chemicals, glassware, and farmhouse used in manufacturing narcotics; informer did lion's share of manufacturing); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971) (Government supplied ingredients for manufacture of illicit whiskey and was only purchaser of final product). In fact, those members of the Supreme Court who have recognized that due process is violated by outrageous Government conduct have drawn a line between situations in which the Government provides contraband and those in which it does not. *Hampton v. United States,* 425 U.S. 484, 498, 96 S.Ct. 1646, 1654, 48 L.Ed.2d 113 (1976) (Brennan, J., dissenting). Similarly, we will closely examine those cases in which the Government misconduct injures third parties in some way. *United States v. Archer,* 486 F.2d 670, 657–77 (2nd Cir.1973). Neither of these situations is presented by the operation of CSF. The Government did not supply defendant with any of the obscene material that he placed in the mail, nor does defendant claim the CSF operation resulted in any injury to a third party. In this case defendant did not photograph any minors

engaged in sexual activity as a result of the Government's inducement, but only videotaped photographs from several publications. In this situation we decline to speculate about the possibility of indirect harm to minors in other investigations.

It should be clear by this point that we do not view the inducement offered by the Government in the case as constituting outrageous misconduct. When a defendant is predisposed to commit the offense due process cannot be violated by Government inducement; to hold otherwise would be to allow a predisposed defendant to raise the functional equivalent of an entrapment defense—a result at odds with the Supreme Court's holdings in this area. *See United States v. Jannotti, supra,* at 608. CSF was nothing more than an undercover operation of an inherently clandestine activity and did not constitute Government misconduct, much less violate defendant's right to due process. As CSF did not violate any of defendant's rights, there is no need to examine whether the investigation could have been run in a more efficient or less intrusive manner, as defendant would have us do.[3]

*V Application of 18 U.S.C. § 2252*

Defendant was convicted under 18 U.S.C. § 2252(a)(1), which provides punishment for: "Any person who ... knowingly transports or ships in interstate or foreign commerce or mails, for the purpose of sale or distribution for sale, any obscene visual or print medium if ... (A) the producing of such visual or print medium involves the use of a minor engaging in sexually explicit conduct; and (B) such visual or print medium depicts such conduct." Defendant claims that the Government failed to prove

---

**3.** Defendant also argues that he should have been permitted to examine the operation of CSF with respect to other targets. We agree with the district court that this information was irrelevant as the only question was whether defendant's rights had been violated. Similarly, whether the investigators violated their own self-imposed standards or procedures is irrelevant to the determination whether defendant's rights were violated as these standards do

not grant defendant any rights. *United States v. Bagnell,* 679 F.2d 826 (11th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983); *United States v. Shelton,* 669 F.2d 446, 459 (7th Cir.1982), cert. denied, 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454; *United States v. Lehman,* 468 F.2d 93, 104 (7th Cir.1972), cert. denied, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232.

a violation of section 2252 in that it failed to prove that the video tapes mailed to the inspectors were obscene and that defendant was a "producer" of obscene material who acted for a pecuniary profit. The contention that the Government failed to prove that the video tapes were obscene is without merit, and the claim that the Government was required to prove that defendant was a producer of the material is based on a misreading of the statute.

■ To prove that the video tapes in question were obscene the Government was obligated to demonstrate that " 'the average person, applying contemporary community standards would find the work, taken as a whole, appeals to the prurient interest ... [that] the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable ... law; and [that] the work, taken as a whole, lacks literary, artistic, political, or scientific value." *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 2614, 37 L.Ed.2d 419 (1973). The Government offered only the tapes themselves as evidence of their obscenity. Defendant does not contest the adequacy of the proof on the final two elements, but does claim that proof that the tapes appeal to the prurient interests of pedophiles required expert testimony.

The Supreme Court has recognized that obscenity "is not a subject that lends itself to the traditional use of expert testimony," *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56 n. 6, 93 S.Ct. 2628, 2634 n. 6, 37 L.Ed.2d 446 (1973), and has repeatedly held that there is no requirement that the Government produce expert testimony on obscenity when the material itself is placed in evidence. *Id.; Hamling v. United States,* 418 U.S. 87, 100, 94 S.Ct. 2887, 2898, 41 L.Ed.2d 590 (1974); *Kaplan v. California,* 413 U.S. 115, 121, 93 S.Ct. 2680, 2685, 37 L.Ed.2d 492 (1973). In *Paris Adult Theatre I,* however, the Court reserved judgment "on the extreme case where contested materials are directed at such a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the pru-

rient interest." 413 U.S. at 56 n. 6, 93 S.Ct. at 2634 n. 6.

Defendant claims that pedophiles are the type of bizarre deviant group that the Court referred to in *Paris Theatre I,* and that expert testimony was therefore required to prove that the video tapes appeal to the prurient interest of pedophiles. In *United States v. Thomas,* 613 F.2d 787, 794 (10th Cir.1980), *cert. denied,* 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114, the court rejected a similar claim in holding that books depicting obscene scenes utilizing children were "not so far removed from the realm of recognizable sexuality as to render normal jury evaluations inappropriate." After examining the relevant case law and the nature of pedophilic material we agree with the result in *Thomas.*

In carving out an exception for bizarre deviant groups, the Court in *Paris Adult Theatre I* cited *Mishkin v. New York,* 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56 (1966), and *United States v. Klaw,* 350 F.2d 155 (2nd Cir.1965), both of which considered material depicting sado-masochistic behavior. In *Klaw* the court held that there must be affirmative proof that pictures depicting "various tortures and indignities, including violent and forcible deformation of the body," appealed to the prurient interest of some deviant group before the jury could be permitted to find the material obscene. *Id.* at 157, 166. Defendant relies heavily upon *Klaw* in his arguments, but that opinion, although well reasoned, is inapposite to the facts before us. Depictions of torture and deformation are not inherently sexual and, absent some expert guidance as to how such violence appeals to the prurient interest of a deviant group, there is no basis upon which a trier of fact could deem such material obscene. In contrast, the only difference between pedophilia and "normal" pornography is the age of the participants depicted. In this respect pedophiles are arguably more closely analogous to homosexuals, who do not follow the normally accepted pattern in their choice of partners, than to sado-masochists. In the same footnote in which *Klaw* is cited in *Paris Adult Theatre*

I, the Court cites with approval *United States v. Wild,* 422 F.2d 34 (2nd Cir.1970), *cert. denied,* 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971), in which the Second Circuit held that there was no need for expert testimony regarding the prurient appeal of hard-core pornography directed toward homosexuals. More recently the same result was reached in *United States v. Bagnell,* 679 F.2d 826, 833 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983). We believe that the same result is required when dealing with pedophilia, and that the tapes were sufficient evidence of their own prurient appeal.

Defendant also claims that even if a jury could determine whether the material was obscene, a judge sitting without a jury could not do so without expert guidance. The Supreme Court saw no such distinction in *Paris Adult Theatre I,* in which the defendant waived jury trial, and we see no basis for allowing a defendant to impose a greater burden of proof upon the Government by demanding a bench trial.

■ Defendant's remaining arguments rest on the assumption that section 2252(a)(1) requires that the Government prove that defendant was a "producer" of the material, which in turn requires that there be proof that defendant acted for a "pecuniary profit." 18 U.S.C. § 2253(3). This argument is based upon a misreading of the statute. Section 2252 requires that the production of the obscene material involve minors, but does not require that the person mailing the material be the person who produced it. Section 2252 punishes those who knowingly ship this material for the purpose of sale regardless of who originally produced it. Production of material involving minors engaged in sexually explicit conduct is made criminal by 18 U.S.C. § 2251. There is no reason why we should adopt a strained reading of section 2252 so that the Government would bear the added burden of proving a section 2251 violation as well. It is enough that defendant knowingly mailed the material for the purpose of sale.

## VI Waiver of Jury Trial

■ Defendant has supplemented his brief by adding the claim that his waiver of jury trial was tainted by the court's failure to inform him that he could participate in the selection of jurors. Defendant admits that his waiver was proper in all other respects. We recently held that the Constitution does not require that a defendant be informed that he can participate in selecting jurors before he can make a knowing and voluntary waiver of his right to a jury trial. *United States ex rel. Williams v. De Robertis,* 715 F.2d 1174 (7th Cir.1983). The only basis for defendant's claim, then, is that this court, in exercising its supervisory powers, has required that a trial court inform a defendant that "a jury is composed of twelve members of the community, that the defendant may participate in the selection of the jurors, and that the verdict of the jury must be unanimous." *United States v. Delgado,* 635 F.2d 889, 890 (7th Cir.1981). In *Delgado* we reversed a conviction when the defendant was provided with *none* of this information prior to waiving jury trial. Here defendant admits that every aspect of a jury trial was explained to him except for his right to participate in the selection of jurors. Furthermore, the transcript reveals that defendant's attorneys claimed to have explained the advantages of a jury trial to him, a claim that defendant did not dispute. In this situation, in which there is no claim that defendant did not make a knowing and voluntary waiver, we decline to reverse defendant's conviction for a *de minimis* violation of *Delgado.*

## Conclusion

For the reasons stated in this opinion we AFFIRM the conviction of defendant.