**UNITED STATES of America**

v.

**Phillip David SWANGER, Defendant.**

**No. ST–CR–87–37.**

United States District Court,
W.D. North Carolina,
Statesville Division.

Feb. 17, 1988.

Max O. Cogburn, Jr., Asst. U.S. Atty., Asheville, N.C., for U.S.

J. Bryan Elliott, Hickory, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

THIS MATTER is before the Court on Defendant's motion to dismiss the indictment, filed October 2, 1987. In support of

the motion, Defendant asserts that the investigative technique used in this action by the Federal Government constitutes outrageous conduct and violates the principle of fundamental fairness embodied in the due process clause of the fifth amendment to the United States Constitution. For the reasons that follow, Defendant's motion will be denied.

## BACKGROUND

At the outset, as a backdrop to the discussion of the present motion, it must be stated that the pernicious evil underlying the crimes charged in the present case threatens the foundation and future of our society: It is child pornography. Congress has addressed this evil by enacting in 1978, 1984, and 1986 legislation designed to prevent and punish the sexual exploitation of children. Recently in 1986, as part of legislation enacted to amend existing statutes, Congress issued a number of findings:

(1) child exploitation has become a multimillion dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children;

(2) Congress has recognized the physiological, psychological, and emotional harm caused by the production, distribution, and display of child pornography by strengthening laws prescribing such activity;

(3) the Federal Government lacks sufficient enforcement tools to combat concerted efforts to exploit children prescribed by Federal law, and exploitation victims lack effective remedies under Federal law; and

(4) current rules of evidence, criminal procedure, and civil procedure and other courtroom and investigative procedures inhibit the participation of child witnesses and damage their credibility when they do testify, impairing the prosecution of child exploitation offenses.

Child Abuse Victims' Rights Act of 1986, Pub.L. 99–500, Title VII, § 702, 100 Stat. 1783–74 (1986); Pub.L. 99–591, Title VII, § 702, 100 Stat. 3341–74 (1986).

A recent report of the Judiciary Committee of the House of Representatives also reflects the concern Congress has long shown in this area:

Of all the crimes known to our society, perhaps none is more revolting than the sexual exploitation of children, particularly for the purpose of producing child pornography. These terrible crimes have long been a concern of the Committee on the Judiciary which developed the original legislation banning this activity in the 95th Congress.

More recently the Subcommittee on Crime has continued to examine the seriousness of this problem. The production and distribution of child pornography continues to be a serious problem.... [T]here may be as many as one half million children and adolescents who are victims of sexual abuse annually.

House Judiciary Comm., *Child Sexual Abuse and Pornography Act of 1986*, H.R. Rep. No. 910, 99th Cong., 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin. News 5952, 5953 (footnotes omitted). Congress' concern could not be more plainly stated.

Faced with the congressional directive to proceed against child pornography, the United States Department of Justice has stepped up its efforts to examine, investigate, and prosecute violations of the criminal statutes directed against child pornography. *See generally* National Center for Missing & Exploited Children, Nat'l Obscenity Enforcement Unit of the United States Dep't of Justice, *Child Pornography and Prostitution: Background and Legal Analysis* (October 1987) (providing background material and summarizing legal and sociological materials related to child pornography). Finally, it should be noted that the United States Supreme Court has held that child pornography material is not entitled to first amendment protection, and, therefore, obscenity need not be proven in criminal prosecutions relating to such materials. *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

The above references clearly show that the evil of child pornography has long been the subject of genuine, and appropriate, national concern. The present motion, however, requires this Court to examine the limits, if any, that may be imposed upon law enforcement officials who are seeking to investigate and prosecute those engaged in this prohibited and obviously detrimental activity. In particular, in deciding the present motion this Court will have to consider whether any limits were exceeded by the federal investigator who, posing as a fictitious company, contacted Defendant Swanger, corresponded with him, and sent child pornography to him through the United States mail.

*Prior Proceedings in the Present Case*

On September 9, 1987, a two count indictment was filed charging Defendant Swanger with alleged violations of Sections 1461 and 2252(a)(2)(A) of Title 18, United States Code. Section 1461 prohibits the use of the United States mail for the conveyance of obscene, lewd, lascivious, indecent, filthy, or vile articles, 18 U.S.C.A. § 1461 (West 1984), and Section 2252(a)(2)(A) prohibits the knowing receipt or distribution of visual depictions involving minors engaged in sexually explicit conduct, 18 U.S.C.A. § 2252(a)(2)(A) (West Supp.1987). The offenses charged in the indictment in the present case occurred when Defendant Swanger received through the United States mail visual depictions of minors engaged in sexually explicit conduct.

On October 2, 1987, Defendant filed a pre-trial motion to dismiss the indictment on the grounds that the Government initiated the transaction from which the charges arose, chose the mails as the medium for delivery, and supplied the contraband material. On October 7, 1987, a Memorandum and Recommendation was filed, in which United States Magistrate J. Toliver Davis recommended to this Court that Swanger's pre-trial motion to dismiss the indictment be denied as being premature. In his recommendation, Magistrate Davis reasoned that Defendant's contention "is one of entrapment which may be asserted at trial after the court and the jury have heard evidence, and it may not properly be considered in a pretrial motion to dismiss." *United States v. Swanger*, ST–CR–87–37, slip op. at 1 (W.D.N.C. October 7, 1987) (Davis, Mag.) ("Memorandum and Recommendation").

On October 15, 1987, Defendant filed written objections to the Magistrate's Memorandum and Recommendation. Defendant objected to the Magistrate's recommendation on two grounds: First, Defendant asserted that the Government's conduct must be closely scrutinized because it supplied the contraband; second, Defendant contended that the Government's investigation in this case constituted "outrageous conduct" violative of the due process clause of the United States Constitution. In support of these two propositions, Defendant cited *United States v. Thoma*, 726 F.2d 1191 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

On December 8, 1987, this Court entered an order overruling Defendant's objections to the Memorandum and Recommendation of the Magistrate. *United States v. Swanger*, ST–CR–87–37, slip op. at 3–4 (W.D.N.C. Dec. 8, 1987). This Court held that Defendant's objections to the manner of the investigation, though properly raised, would have to wait until presentation at trial of evidence concerning the circumstances surrounding the offenses. *Id.* ("Defendant timely raised the issue of entrapment in his Motion, but that issue is not ripe for determination.") (citing *United States v. Williams*, 644 F.2d 950, 951–953 (2d Cir.1981)). Thus, Defendant's motion to dismiss the indictment was left undecided pending the outcome of his trial.

*The Trial*

On December 15, 1987, the trial of this matter began. The testimony and exhibits admitted into evidence at the trial can be summarized, in relevant part, as follows:

In 1985, United States Postal Inspector Jim Charlton began an investigation into crimes committed by people using the United States mail to convey child pornography materials. To pursue his investigation,

Charlton used a "reverse sting" operation: Charlton decided that he would pose as a company engaged in the illicit distribution of child pornography materials; such fictitious company would solicit orders from people identified as consumers of child pornography, and postal inspectors would make controlled mail deliveries of the contraband materials to those who actually placed orders.

The starting point for Charlton's investigation into Defendant Swanger was his determination that Swanger was a consumer of child pornography. Sometime in 1985 Charlton received from another postal inspector a 3 × 5 index card with Defendant Swanger's name and address on it. Gov't Exh. 16, *United States v. Swanger*, ST-CR-87-37 (W.D.N.C.). According to the Government's witnesses, Swanger's name appeared on the index card because it was on a list of customers which was seized from a child pornographer. The original list of purported customers, however, was never introduced into evidence at the trial. Throughout this action Defendant has vigorously contested the Government's assertion that he was a consumer of child pornography *before* Charlton's investigation.

After receiving Swanger's address, Charlton, posing as the phony company, began corresponding with Swanger. During their correspondence, Charlton and Swanger exchanged through the mails a series of letters over the course of approximately eighteen months. Gov't Exhs. 1–14, *United States v. Swanger*, ST-CR-87-37 (W.D.N.C.). The Government's "reverse sting" investigative technique cannot be understood completely without a description of the course of the correspondence and the contents of the letters, and, therefore, such description follows—the relevant portions have been summarized when possible, but some portions have been reproduced in their entirety in order to preserve their actual content and probable impact on Defendant Swanger.

On May 13, 1985, Charlton sent a letter to Swanger on letterhead paper bearing the name F & H Associates and a Columbia, South Carolina, address. Gov't Exh. 1.

Three small silhouettes appear on the top the stationery: Two adults, apparently male and female, and a female child are depicted. The envelope the letter came in bears a United States commemorative stamp with the word LOVE. All of the envelopes sent by Charlton to Swanger bear LOVE commemorative stamps.

The May 13th letter was the very first one Swanger received from the fictitious F & H Associates company, and it set the tone for the entire correspondence between Charlton and Swanger. It reads as follows:

Dear Friend:

We would like to take this opportunity to introduce ourselves to those of you who are unfamiliar with our company. We started as a small neighborhood service specializing in putting people in contact with each other who have similar interests. We have now decided to enlarge our group. We obtained our list of names from various businesses that cater to sexually liberated adults and other legitimate individuals who gave us names of persons they thought would like to become part of our group.

This particular service is offered to people free of charge. There are many other services that we plan to offer in the future that will be offered to our friends at a nominal charge. We will, at a later date, notify all of you of these services. We, like other people, enjoy varied types of sexual activity of which we feel there is nothing wrong as long as it takes place between willing and consenting participants. One of the difficulties we have encountered in the past is that there is a portion of society that wants to label these activities as "immoral" or "unhealthy." With this type of attitude, present society has made it very difficult for all of us to express, explore, and enjoy our feelings for other individuals. Because of this difficulty, our company has decided to offer this contact service free of charge.

In order that we may better serve each individual in contacting people with similar interests, we ask that you complete

the following questionnaire for our records. Any information supplied will be used by our company only.

If our company or services are of no interest to you, please disregard this letter.

Sincerely,

Harvey Little

President.

Gov't Exh. 1 (emphasis in the original).

Swanger returned the information sheet sent to him by Charlton. Swanger filled in his name and address, and his age, sex, and race. The information sheet listed ten categories of sexual preferences, including bondage, Greek, French, and others. Swanger indicated that he was interested in two types of sexual activities: Straight sex and voyeurism. The information sheet also had a section requesting a preference to be expressed as to age categories, and these ranged from one-year olds to those over fifty years of age. Swanger initially checked *all* of these categories, but before sending the information sheet to F & H Associates, he crossed out all of these age preferences. Gov't Exh. 2. On the back of the information sheet, Swanger indicated that he was interested in Straight Sex, Child/Child, Child/Adult, and Lolitta. "Lolitta," of course, refers to a sexual relationship between a man and a pre-teenager such as the one described in the decidedly non-pornographic novel *Lolita* written by Vladmir Nabokov. *See* V. Nabokov, *Lolita* (1955).

On May 20, 1985, Charlton sent a second letter to Swanger. The May 20th letter was on the same stationery as the May 13th letter, and it was also signed by the fictitious Harvey Little. It reads as follows:

Dear P.D. Swanger:

We at F & H were pleased to receive your reply to our questionnaire and glad you took the time and effort to reply. We wish to thank you for your response. We are part of a nationally growing alliance of people who wish to protect and promote sexual freedom for all. We have found the best way to accomplish our goals of sexual freedom for all is to put individuals with similar interests in touch with others and to continue to lobby with state legislators. We are currently trying to have state laws regulating sexual activities changed for the better and to stop the harassment of honest citizens. We also wish the so-called "age of consent" changed.

We want your anonymous grass roots support—not your money. We don't want contributions or membership fees. We will be publishing a catalog soon offering the sale of various items which we believe you will find sexually stimulating. The money obtained from these sales will be used to continue our efforts. You are not obligated to buy anything. We also plan to offer a newsletter free of charge to anyone who wants it which will contain information on sexual freedom for all.

We have computer matched your response with those responses of others who have allowed us to refer to their names. Enclosed with this letter are these matches. You may or may not want to contact these people directly concerning your similar sexual interests. If we have helped you to find someone with who you can relate sexually—that will be our reward.

If you wish to receive our catalog or newsletter, just send us a note advising which ones you want. Please state in your letter that you are aware these publications will contain sexually explicit, hard-core letters, stories, and photographs and that you wish to receive them of your own free will.

We welcome any comments or suggestions you would like to make concerning our programs.

Gov't Exh. 3 (emphasis in original). The names and addresses of the fictitious "pen-pals" were provided to Swanger, but he never sent any letters to these addresses.

On July 11, 1985, Swanger wrote a handwritten letter to F & H Associates. Gov't Exh. 4. In the letter, Swanger stated "I filled out and returned your form some time back listing what my interests were. However I have never received a list to

order any of those items from you. Please send one." *Id.*

On July 22, 1985, Charlton sent a third letter to Swanger on the F & H Associates' stationery. Gov't Exh. 5. In the July 22nd letter, Charlton, under his fictitious identity of Little, promised Swanger that a catalog was being prepared and that it would be sent to him as soon as it was ready. *Id.* In particular, Charlton indicated that the "material is not your usual material and we also have to take certain precautions in offering it to the public." *Id.* Finally, Charlton mentions in the letter that in the future there will be a party in the Charlotte, North Carolina area.

On September 19, 1985, Charlton sent an F & H Associates' newsletter to Swanger. Gov't Exh. 6. The newsletter is a seven-page document that includes an editorial, reader's letters, newspaper-clipping reprints, feature sections called "Hot tips" and "Traps," an advertisement for a film developer offering confidential services, and an invitation to the annual F & H party. The newsletter is a fairly sophisticated product, and it contains several elements calculated to lend authenticity to F & H Associates. Some of the newsletter's relevant contents will be reproduced below:

EDITORS COMMENTS:

 . . . .

 . . . .

Another important part of our newsletter will be "Traps" to watch for. "Screw" magazine and other national publications often print warnings of various police entrapments they have run across and have saved many readers from an embarrassing introduction to the police. *We must say we don't plan to do anything illegal ourselves and know our readers don't either, but in this day and age who knows what is legal and what isn't. We would ask all of you to keep us advised of any newspaper account you may see of sexual harassment arrests so we can attempt to warn others who may not have seen that particular newspaper.*

 . . . .

TRAPS

This may be the most beneficial section we have in our newsletter for some of you. In this age of renewed gestapo tactics by our government, there are always new traps being developed to get you. . . . . I guess these cops don't believe in the U.S. Constitution because it guarantees us the absolute right to *not be censored* and to be secure in our homes. . . . .

The local, state, and federal cops are engaged in a conspiracy and are making illegal arrests of people who go to adult book stores (against freedom of movement), people who buy and sell erotic material (censorship), people who have sex with any one younger than eighteen (freedom of choice), etc, etc, etc.

The Constitution and the First Amendment to the Constitution guarantee your freedom and you are going to have to fight the government to maintain these rights.

 . . . . We believe that in less than a year both pornography and marijuana will be legalized. With everyone's support this will happen.

 . . . .

 . . . .

HOT TIP

Dear F & H,

Law enforcement officers and Federal Agents will not send you a statement saying that they are not undercover cops trying to bust you!!!! This is entrapment and makes all the evidence inadmissible against you because they lied to you about who they really are. So, why not get your pen-pals to send you a signed statement like this:

I AM NOT A LAW ENFORCEMENT OFFICER OF ANY TYPE NOR AM I WORKING FOR ANY LAW ENFORCEMENT AGENCY.

That's all it takes. If they don's want to sign such a statement—then forget them. BH, Asheville, NC

EDITORS NOTE: This is a good tip for all of us to use, although it is not entirely correct. But it is true cops won't sign such a statement. Twenty-five dollars to BH of Asheville for his hot tip.

**EDITOR'S HOT TIP**

Do not write to anyone using the name Allan Myers or Joe Ritchie, San Diego, California. They are FBI agents!

*Id.* at 1–6 (emphasis added). In addition to the above-quoted material, there are newspaper accounts related to child pornography and child molestation.

On September 24, 1985, Swanger sent to Charlton the last page of the newsletter, which was a RSVP form to be used for the 1985 F & H Associates party. Swanger did not fill out the RSVP form, but, instead, he did write a handwritten note inquiring about the catalog. Gov't Exh. 7.

Almost *one year* later, on August 22, 1986, Charlton sent Swanger a cover letter and a one-page catalog. Gov't Exh. 8. The delay, according to Charlton, was due to difficulties he had in preparing the catalog. Six descriptions of adult pornography are listed in the catalog. In addition, the catalog notes that a "Kinder Climax Collection" catalog could be obtained from F & H Associates "with selections featuring new Lolita and Wonderboy talent." *Id.*

On August 28, 1986, Swanger returned the order form and requested the "Kinder Climax Collection" catalog. Gov't Exh. 9. Swanger did not order any of the adult pornography films described in the August 8th catalog.

On September 2, 1986, Charlton sent a one-page "Kinder Climax Collection" catalog to Swanger. Gov't Exh. 10. Its contents are set out below:

CARNIVALE—Hector celebrates gala festival with Juan, 5 years; Pablo, 7 years; and Roberto, 9 years. All four have great celebration with mutual masturbation, oral and anal sex.

. . . .

SPRING RITES—Erik, 11 years, and Kurt, 14 years, frolic with change of seasons. Plenty of strong masturbation and oral sex. Comes to dramatic climax.

. . . .

SCHOOL DAYS—Marco, 14 years; Krista, 13 years; and Bette, 12 years, unwind after a hard day at lessons. Interesting masturbation and oral sex, with slight penetration.

. . . .

MOTHER LOVES LOLITAS—Two segments. Part One: Rachel, 15 years, and Margaret, 16 years, learn the facts of life from an older brother—plenty of masturbation and great penetration. Part Two: Tammy, 6 years, gives mother extreme pleasure with dildo and mother reciprocates by giving Tammy's lovely vagina a real workout with dildo—Sis comes home from school and joins in the fun.

. . . .

BRIDGITTE GOES ON A HOLIDAY—After a full day of sightseeing, Bridgitte, 8 years, and her mother relax with dildo. Bridgitte gives and receives oral sexual pleasures.

. . . .

ALL IN THE FAMILY—Bridgitte, 8 years, and mother return from holiday and share hidden secrets with papa. No need for dildo. Mother stimulates Bridgitte's vagina with papa's penis. Bridgitte learns to give oral sexual pleasure to papa.

*Id.*

On September 8, 1986, Swanger ordered two video cassette tapes from F & H Associates by sending the "Kinder Climax Collection" order form to Charlton with a United States postal money order in the amount of eighty dollars. Gov't Exh. 11. On September 30, 1986, Swanger wrote a letter to F & H Associates stating that he had ordered tapes and had not received them yet. Gov't Exh. 12.

On October 6, 1986, Charlton wrote another letter, on F & H's stationery, to Swanger under the fictitious name of Harvey Little. Gov't Exh. 13. In the letter, Charlton told Swanger that the tapes would be delivered and that Swanger should be patient. *Id.* Finally, on November 12, 1986, Swanger wrote a letter to F & H Associates in which he again inquired into the status of his order and asked "[w]ill the order be forth coming [sic] or a refund?" Gov't Exh. 14.

Subsequently, on November 21, 1986, Swanger received a message that a package was waiting for him at the post office.

Charlton had prepared two videocassettes containing visual depictions of minors engaged in sexually explicit conduct by copying seized child pornography tapes. Postal Inspectors made a controlled delivery of the duplicate tapes to Swanger's post office box, and Swanger was arrested the moment he received the tapes at the post office. Swanger never viewed the videocassettes he ordered.

Inspector Charlton testified that the investigation into Swanger would have ceased if Swanger had at any time prior to the delivery indicated he was not interested in child pornography materials. Thus, Swanger did have the opportunity throughout the course of his correspondence to withdraw, or "get off the train." Unfortunately for Swanger, he did not.

Swanger testified at the trial that he only ordered the materials because he had never heard of such things before, and did not know what they were. Swanger stated that he thought F & H was a big company, and that he did not know he was breaking the law when he ordered the tapes. In particular, Swanger testified that he thought "Child/Child," which was a category listed on the back of the F & H information questionnaire, was about children playing games. None of Swanger's testimony was very credible.

On December 16, 1987, this Court instructed the jury on the law and provided instructions on the defense of entrapment. Defense counsel did not object to the jury instructions on entrapment. After deliberating, the jury found Defendant Swanger guilty of both counts of the indictment. This Court deferred sentencing until February 1988 in order to permit Defendant to obtain a psychological evaluation.

### Recent Matters

On February 1, 1988, Defendant filed a one-page memorandum in support of his motion to dismiss the indictment. Such a post-trial memorandum is appropriate, of course, because the motion to dismiss the indictment is still pending before this Court. On February 10, 1988, this Court indicated that Defendant Swanger's motion to dismiss would be denied and sentenced Swanger to a two-year term of imprisonment on both counts, which were merged for the purpose of sentencing.

### CONTENTIONS OF THE PARTIES

#### Defendant Swanger

Defendant Swanger has provided this Court startlingly little legal authority to support the proposition he is urging this Court to adopt. He has, however, properly framed the issue. The issue is whether this Court should dismiss the indictment against Swanger now, after the jury has returned a verdict indicating a rejection of Defendant's entrapment defense. Such a dismissal, according to Defendant, may be premised on the idea that the Government's conduct in the present case constitutes "outrageous conduct." To support this legal proposition, Defendant has cited *United States v. Thoma*, 726 F.2d 1191 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984), and *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). In particular, Swanger asserts that the Government's investigation in this case transgressed the limits imposed on investigative techniques since the Government initiated the first contact, supplied the contraband, and chose the mails as the medium of delivery.

#### The Government

On February 12, 1988, the Government filed a response to Swanger's motion to dismiss. First, the Government asserts that *United States v. Thoma*, 726 F.2d 1191 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984), does not support Swanger's motion because the *Thoma* court held that the investigative technique used by the Government in that case, which is similar to the technique used in the present case, did not violate due process. *Thoma*, 726 F.2d at 1196–98.

Second, the Government distinguishes *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), by noting that in the present case Swanger had several opportunities to "opt out" of the stream of correspondence. By

contrast, the DEA investigators in *Twigg* contributed substantially towards the completion of the criminal enterprise—the setting up of a speed laboratory—and actually helped the defendants to overcome any obstacles standing between them and completion of the manufacturing process. The Government asserts it was "[o]nly because Swanger persisted in expressing his culpable interest [that] he was *allowed* to order the child pornography through the mail." Government's Response at 2, *United States v. Swanger*, ST–CR–87–37 (W.D. N.C. filed Feb. 12, 1988).

Finally, the Government points out that the United States Court of Appeals for the Fourth Circuit has never reversed on due process grounds a conviction obtained through an undercover investigation. *Id.* at 4 (citing *United States v. Milam*, 817 F.2d 1113 (4th Cir.1987)).

## ANALYSIS OF THE APPLICABLE LAW

The United States Supreme Court has not spoken with clarity on the limits that the fifth amendment's due process clause places upon the Government in its criminal investigations. *See generally* Blecker, *Beyond 1984: Undercover in America—Serpico to Abscam*, 28 N.Y.L.Sch.L.Rev. 824, 863–865 (1984) (analyzing *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), and concluding that "a subjective entrapment defense continue[s] as the majority rule, but due process remain[s] a viable possibility even to predisposed and therefore non-entrapped defendants"). Nevertheless, it appears that

a due process defense exists separately ... from entrapment. That defense does not stem from the Court's supervisory authority over the federal judicial system; nor is it implied in congressional statutory intent. Rather, due process outlaws only outrageous behavior, which is not merely distasteful but so fundamentally unfair as to be <u>unconstitutional</u>.

*Id.* at 993 (footnotes omitted) (emphasis in original); *see also United States v. Hunt*, 749 F.2d 1078 (4th Cir.1984) ("the Supreme Court has suggested that such a defense might be proper in certain circumstances, [but] it has yet to allow a due process attack on a government investigation to prevail"), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985).

In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court reversed a decision of the United States Court of Appeals for the Ninth Circuit, which had held that a conviction for manufacturing an illicit drug could not stand because a Government agent was responsible for supplying an essential, hard to obtain, chemical needed for the manufacturing. In reversing the court of appeals, the Supreme Court, in a five to four decision, held that a *per se* rule of could not be adopted to preclude any prosecution "when it is shown that the criminal conduct would not have been possible had not an undercover agent 'supplied an indispensable means to the commission of the crime that could not have been obtained otherwise, through legal or illegal channels.'" *Id.* at 431, 93 S.Ct. at 1642. The Court found that the agent had only provided a chemical difficult, but not impossible, to obtain: Defendant Russell had obtained the chemical from non-governmentally linked sources before, and therefore the government's agents did not in fact provide an indispensible element for the manufacturing process. *Id.* The Court concluded that Russell had not been entrapped, and that his due process rights had not been violated.

Justice Rehnquist, writing for the majority, remarked in passing that:

While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed..... The law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–432, 93 S.Ct. at 1643 (citations omitted) (citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)). Thus, the Court left open the possibility that a defense based upon the due process clause could be established.

In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a three justice plurality of the Court substantially narrowed the door left open by *Russell. Id.* (Rehnquist, J., joined by Burger, Ch. J., and White, J.) In *Hampton,* a defendant challenged a two count conviction for distributing heroin. In particular, Defendant Hampton argued that he was entitled to a jury instruction to the effect that even if he were predisposed to distribute heroin the jury should acquit him if it found that a government informant had supplied the heroin. The Court affirmed Hampton's conviction and held that he was not entitled to the requested jury instruction. Justice Rehnquist, writing for the plurality, stated, in pertinent part, the following:

> In *Russell* we held that the statutory defense of entrapment was not available where it was conceded that a Government agent supplied a necessary ingredient in the manufacture of an illicit drug. We reaffirmed the principle ... that the entrapment defense "focus[es] on the intent or predisposition of the defendant to commit the crime," rather than upon the conduct of the Government's agents. We ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established.

*Hampton,* 425 U.S. at 488–489, 96 S.Ct. at 1649 (Rehnquist, J.) (citations omitted).

Despite the strong language cited above, *Hampton* did not absolutely close the door on the availability of the due process claim to predisposed defendants. *See* Blecker, *supra* p. 551, at 863–865 (noting that *Hampton* was a 3–2–3 decision). This con-clusion is supported by Justice Powell's key concurrence in *Hampton:*

> The plurality ... says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances.
>
> I do not understand *Russell* or earlier cases delineating the predisposition-focused defense of entrapment to have gone so far, and there was no need for [the plurality] to do so. In those cases the Court was confronted with specific claims of police "overinvolvement" in criminal activity involving contraband. Disposition of those claims did not require the Court to consider whether overinvolvement of Government agents in contraband offenses could ever reach such proportions as to bar conviction of a predisposed defendant as a matter of due process. Nor have we had occasion yet to confront Government overinvolvement in areas outside the realm of contraband offenses. In these circumstances, I am unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles.

*Id.* at 492–493, 96 S.Ct. at 1651–1652 (Powell, J., concurring, joined by Blackmun, J.) (footnotes and citations omitted) (citing *United States v. Archer,* 486 F.2d 670, 676–677 (2d Cir.1973) (noting that it would be "unthinkable ... to permit government agent to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums")).

Since *Hampton* and *Russell* were decided, the United States Court of Appeals for the Fourth Circuit has had a number of occasions to consider the applicability of the due process clause to convictions of defendants who are shown to be predisposed. *E.g., United States v. Milam,* 817 F.2d 1113 (4th Cir.1987) (discussing due process argument in relation to counterfeiting case); *United States v. Akinseye,* 802 F.2d 740, 742–743 & n. 2 (4th Cir.1986) (making distinction between entrapment and due process claim); *United States v.*

*Hunt*, 749 F.2d 1078 (4th Cir.1984) (recognizing that a due process claim may exist apart from entrapment issue), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985); *United States v. Perl*, 584 F.2d 1316, 1320 (4th Cir.1978) (recognizing that entrapment is a statutory defense rooted in the notion that Congress could not have intended to criminally punish those who commit elements of crime but are induced by the Government to commit the acts, and that "outrageous conduct" defense is rooted in constitutional law).

In *United States v. Hunt*, 749 F.2d 1078, the United States Court of Appeals for the Fourth Circuit explained the basis for a due process claim of the sort asserted by Defendant Swanger in the present case:

> [A]ppellant also urges us to find that the government's conduct of the investigation was so outrageous as to violate due process, *a claim distinct from the unsuccessful entrapment defense.* While the Supreme Court has suggested that such a defense might be proper in certain circumstances, it has yet to allow a due process attack on a government investigation to prevail, and only two circuits have set aside convictions on this basis.

*Hunt*, 749 F.2d at 1087 (emphasis added and citations omitted). The two of the circuits referred to by the court of appeals are the Third and Ninth Circuits, and the cases are *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), cited by Defendant Swanger, and *Greene v. United States*, 454 F.2d 783 (9th Cir.1971).

Recently, in *United States v. Milam*, 817 F.2d 1113, the Fourth Circuit had occasion to again re-visit the due process defense, and in the process it distinguished *Twigg* and *Greene*. *Milam*, therefore, provides some guidance to this Court on the issue of the "outrageous conduct" defense, and it will be examined in some detail.

In *Milam*, two defendants appealed the district court's denial of their motion to dismiss the indictment against them. Defendants claimed in both the district court and the appellate court that the government's conduct in investigating them was so outrageous that it violated due process principles. *Milam*, 817 F.2d at 1114. Defendant Swanger, in the present case, is, of course, making the exact same claim.

In *Milam*, Secret Service agents learned from an informant that several people wanted to purchase counterfeit currency. *Id.* A man named Cartwright had approached the informant and said that there was a backer, Defendant Piraino, who would be willing to purchase equipment and supplies to make counterfeits. The informant, Piraino, and Cartwright all met at the informant's shop one day, but at the meeting Piraino told the informant he wanted to cut Cartwright out of the deal. From that point on, the Secret Service agents conducted separate investigations on Piraino and Cartwright. *Id.*

In the Secret Service's investigation of Cartwright, undercover agents supplied him with counterfeit plates and the necessary paper, gave technical assistance, and helped transport a printing press. Cartwright printed a substantial amount of currency with the materials he was provided, and he was arrested. After Cartwright's arrest, agents tried to sell some counterfeit currency to Piraino, but he would not buy it. Subsequently, the Secret Service discontinued its investigation of Piraino. *Id.* The validity of Cartwright's arrest and prosecution was not considered by the Fourth Circuit in *Milam*.

Some months later, Piraino again contacted the government's informant and again inquired about buying counterfeit currency. A meeting was arranged, and Piraino was accompanied to the vicinity by two other men, Jack Milam and John Milam. The Milams waited in a car while Piraino met with a undercover agent of the Secret Service. After a buy of counterfeit currency was executed by Piraino, he was arrested. The Defendant John Milam's arrest followed shortly thereafter when a Secret Service agent approached the Milams and asked if they were Piraino's friends. When the Milams replied affirmatively, the agent told them that Piraino was upset with the quality of the counterfeit currency and would not go through with the deal unless the Milams approved the

notes. John Milam was arrested as he handled the currency. *Id.*

In rejecting Piraino's and Milam's due process claims in *Milam*, the Fourth Circuit noted:

> The government agents' conduct in their pursuit of Piraino and Milam was not so "outrageous" that it violated due process principles. First, ... the illegal activity did not originate with the government or its informant. Piraino initiated the contact with ... the government informant, through Cartwright. Alerted to Piraino's interest, the agents met with him and offered to sell him counterfeit currency. When he declined, they dropped their investigation and reopened it only when Piraino again contacted [the informant].... After Piraino's arrest, [Secret Service agents] approached Milam and in essence provided an opportunity for him to indicate his participation in the crime. *In a sense the government "initiated" this contact, but this is not a case in which government agents approached an innocent person and offered an opportunity to participate in a crime. Milam had already indicated that he was involved by accompanying Piraino to the meeting ... and by handling the sample note.*

*Milam,* 817 F.2d 1115–16 (emphasis added) (distinguishing *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978)).

In the present case, there is no outrageous government conduct which violates the due process clause of the fifth amendment. First, Postal Inspector Charlton did not pick Defendant Swanger's name out of the blue. Instead, he obtained Swanger's name from a card which was prepared from a list of persons thought to be consumers of child pornography. Swanger's name apparently appeared on the list because he had in the past sought such material, and therefore the "first contact" with the child pornography world was made by Defendant Swanger. Since Swanger decided to risk dealing with people engaged in the despicable business of child pornography, he lost whatever anonymity he once had.

This Court cannot see any great difference between the defendants in *Milam* who initially contacted the Government's informant and arranged to meet with undercover agents and Defendant Swanger who initially contacted a child pornographer whose mailing list fell into the hands of the Federal Government. In both cases, the defendants themselves voluntarily reached out into the criminal world. Milam voluntarily accompanied Piraino to the meeting where Piraino was supposed to buy countefeit currency, and he voluntarily and knowingly handled the counterfeit currency offered to him by the undercover agents. Similarly, Swanger voluntarily contacted a child pornographer before any Postal Service investigation was begun. When Swanger received the letters from F & H Associates, he voluntarily sent responses indicating that he desired to obtain child pornography through the United States mail. Although technically the Government initiated the first contact with Swanger, "this is not a case in which government agents approached an innocent person and offered an opportunity to participate in a crime." *Id.* at 1116. Defendant's own actions led the Government to receiving his name in the first place.

In any event, Defendant Swanger was free to refuse to correspond with F & H Associates. Even if this Court were to accept for the purpose of argument Defendant's implicit assertion that he never initiated the first contact, it would remain clear that he did initiate the stream of correspondence that followed from the return of the questionnaire. It was Swanger who signaled loud and clear that he was interested in child/child, child/adult, and Lolitta sex. If he had not indicated such preferences, Inspector Charlton would have ended the investigation. Instead, Defendant Swanger entered into a stream of correspondence which was geared toward one end: The obtaining of child pornography materials through the mail. Swanger could have ended the correspondence stream at any time, and if he did, the Government would have ceased its investigation. *See Milam,* 817 F.2d at 1114. Although Swanger could have indicated at

any time that he did not have any interest in child pornography, he did not. Since Defendant Swanger voluntarily entered into the stream of correspondence that led to the ordering of the videocassettes, this Court believes it is immaterial that the Government made a first, generalized contact. It certainly does not constitute outrageous conduct.

A different result, of course, would be required if the Postal Inspectors had mailed the initial inquiry form to the general public. *See id.* at 1116. The general public has the right to be let alone. *See Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). If the Government were to use the general public as the target group for its initial inquiry, such a fishing expedition for criminals may very well constitute outrageous conduct. In the present case, however, the Government had a good faith basis for pursuing Defendant Swanger, and with such a good faith basis the Government could safely make contact with him.

Defendant's reliance upon *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), is misplaced. In *Twigg*, an informant approached a man named Neville, whom he had known in the past, and asked him if he wanted to set up a speed laboratory. Neville agreed, and thereafter Government agents provided practically all of the equipment, chemicals, and know-how necessary to set up and run a speed laboratory. *Id.* at 375–376. Neville's codefendant, Twigg, was brought into the illicit enterprise apparently to repay a debt he owed to Neville. Both Neville and Twigg were arrested, charged with controlled substances offenses, and convicted. On appeal, the Ninth Circuit considered the appropriateness of a due process defense. After analyzing *Russell* and *Hampton* and several pre-*Hampton* cases, the Ninth Circuit reversed both Neville's and Twigg's controlled substances convictions.

The *Twigg* court held that Neville's conviction could not stand because the record revealed that Neville was "lawfully and peacefully minding his own affairs" at the time he was approached by the Government's informant. *Id.* at 381. After Neville agreed to participate in the manufacturing of speed, DEA agents "set him up, encouraged him, provided the essential supplies and technical expertise, and when [Neville and the Government's informant] encountered difficulties in consummating the crime, they assisted in finding solutions." *Id.* The *Twigg* court found such activities "egregious," and held that "[f]undamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." *Id.* The *Twigg* court also held that the DEA agents conduct tainted Twigg's conviction because his involvement and intention were minimal. *Id.* at 382. By contrast, Swanger was apparently involved in the dark underworld of child pornography before any Governmental contact. Swanger did not need much encouragement to stay involved in the stream of correspondence with F & H Associates, and, indeed, Swanger aggressively pursued F & H Associates whenever there was a delay: Each time Charlton did not immediately reply to Swanger's requests for information or catalogs or tapes, Swanger wrote and reminded Charlton that he was still ready, willing, and able to accept such materials through the mails.

■ Second, Defendant's objection to the Government's choice of the mails as the delivery mode is likewise without merit. Defendant was well aware at the time he sent the order form that the mails would be used to deliver his merchandise. Defendant was not unduly perturbed by this. In fact, it appears to this Court that Swanger maintained a steady stream of correspondence with F & H Associates through the mail because he preferred the mails as his mode of delivery. As the Government has stated in its response, "Swanger was an enthusiastic correspondent from the start." No one forced him to use the mails. The Government's utilization of the mails to complete a process set in motion by Swanger through the order form cannot be deemed to constitute outrageous conduct.

■ Finally, Defendant's objection to the Government's provision of the contraband tapes themselves is without merit. As the Fourth Circuit noted in *Milam*, "Justice Powell's concurrence in *Hampton* recognized that the practicalities of law enforcement sometimes compel officers to ... supply 'contraband itself,' and suggested that due process does not necessarily prohibit use of these and similar investigative techniques." *Milam*, 817 F.2d at 1116 (quoting *Hampton v. United States*, 425 U.S. at 491–492, 96 S.Ct. at 1651). *But see United States v. Thoma*, 726 F.2d 1191, 1198–99 (7th Cir.) (Government did not supply contraband child pornography, and therefore no due process violation would be found), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

In sum, Defendant's claim that the Government's conduct in this action violated his right to due process is unfounded because the Government's actions in this case did not rise to the level of outrageous conduct which disturbs common ideas of fundamental fairness. *See Milam*, 817 F.2d at 1116.

There are *aspects* of the Government's investigation, however, that are disturbing. In the newsletter of September 19, 1985, Gov't Exh. 6, there are several comments that are seem to be calculated to lull the recipient into the belief that F & H Associates is engaged in a legitimate business. Such a belief may appear unreasonable to people both uninterested in child pornography and knowledgeable about the legitimate prohibitions against such materials, but the newsletter leaves the distinct impression it is geared toward a fringe group that is being *illegally and unjustifiably* persecuted. For example, the newsletter states, "[w]e must say we don't plan to do anything illegal ourselves and know our readers don't either, but in this day and age who knows what is legal and what isn't." Similarly, the newsletter goes on to explain that "[t]he local, state, and federal cops are engaged in a conspiracy and are making illegal arrests of people who go to adult book stores (against freedom of movement), people who buy and sell erotic material (censorship), people who have sex with any one younger than eighteen (freedom of choice), etc, etc, etc." Finally, the newsletter concludes, "the Constitution and the First Amendment to the Constitution guarantee your freedom and you are going to have to fight the government to maintain these rights."

■ When Government officials acting in their official capacity make affirmative misrepresentations about the legality of conduct, these misrepresentations may provide a bar to prosecutions against persons who reasonably relied upon such representations. *See Cox v. Louisiana*, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (holding conviction for demonstrating "near a courthouse" could not be sustained against defendant who demonstrated in an area that public officials had represented as being appropriate for demonstrating); *see also* W. La Fave & A. Scott, *Criminal Law* 367 (1972) (noting that reasonable reliance upon official interpretation of law can provide a defense similar to the entrapment and due process defenses). Such a rule, however, does not fit nicely onto the facts of the present case because no one could have reasonably relied upon the newsletter's representations about the legitimacy of F & H Associates: The newsletter did not in any way represent that its legal theories were based upon authoritative sources, nor did the newsletter appear to come from an official governmental body. Under the totality of the circumstances, a reasonable person should have known that the child pornography activities solicited and facilitated by F & H Associates were, in fact, illegal. Nevertheless, it remains troubling that the Government's undercover investigators made misrepresentations about the legality of the conduct under investigation. While this Court is unwilling to attempt to prescribe guidelines that investigators should observe, it must be noted that due process violations may arise in future investigations when false representations are made that a reasonable person could rely on concerning the legality of the conduct under investigation.

**CONCLUSION**

NOW, THEREFORE, IT IS ORDERED that Defendant's motion to dismiss the indictment in this action is DENIED.